WR-71,401-01
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 2/9/2015 12:10:41 PM
Accepted 2/9/2015 1:47:09 PM
ABEL ACOSTA
CLERK

## IN THE TEXAS COURT OF CRIMINAL APPEALS

### AUSTIN, TEXAS

RECEIVED
COURT OF CRIMINAL APPEALS
2/9/2015
ABEL ACOSTA, CLERK

|  |  |  |
|---|---|---|
| | ) | **Writ No.** |
| **EX PARTE** | ) | **WR-71,401-01** |
| **JUAN RAUL** | ) | |
| **NAVARRO-RAMIREZ,** | ) | |
| **APPLICANT** | ) | |
| | ) | |
| | ) | |

## APPLICANT'S OBJECTIONS TO THE TRIAL COURT'S RECOMMENDATION THAT RELIEF BE DENIED ON HIS ARTICLE 11.071 INITIAL APPLICATION

BRAD D. LEVENSON (No. 24073411)
Director, Office of Capital Writs
(Email: Brad.Levenson@ocw.texas.gov)
JEREMY SCHEPERS (No. 24084578)
(Email: Jeremy.Schepers@ocw.texas.gov)
ERIN ECKHOFF (No. 24090910)
(E-Mail: Erin.Eckhoff@ocw.texas.gov)
Post-Conviction Attorneys
Office of Capital Writs
1700 N. Congress Ave., Suite 460
Austin, Texas 78701
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Applicant

# IN THE TEXAS COURT OF CRIMINAL APPEALS

## AUSTIN, TEXAS

|  |  |  |
|---|---|---|
| EX PARTE JUAN RAUL NAVARRO-RAMIREZ, APPLICANT | ) ) ) ) ) ) ) | **Writ No. WR-71,401-01** |

## APPLICANT'S OBJECTIONS TO THE TRIAL COURT'S RECOMMENDATION THAT RELIEF BE DENIED ON HIS ARTICLE 11.071 APPLICATION

Juan Raul Navarro-Ramirez ("Ramirez"), by and through his attorneys, the Office of Capital Writs ("OCW"), respectfully requests that this Court grant relief on his Initial Application for Writ of Habeas Corpus or, in the alternative, remand his case back to the convicting court for additional findings. *See* TEX. CODE CRIM. P. art 11.071 § 11. In independently reviewing the Findings of Fact and Conclusions of Law ("Findings and Conclusions") signed by the convicting court, Ramirez asks this Court to address several erroneous conclusions that were made. *Ex parte Chavez*, 371 S.W.3d 200, 207 (Tex. Crim. App. 2012) ("When our independent review of the record reveals that the trial judge's findings and conclusions are not supported by the record, we may exercise our authority to make contrary or alternative findings and conclusions."). Three areas deserve special attention from this Court when conducting its independent review: (1) lead counsel was not qualified to be appointed to represent Ramirez, and the team she assembled had no experience in cases where the State was seeking death; (2) the convicting court adopted the State's categorization of trial counsel's performance as "commendable," despite numerous examples of deficient performance that harmed Ramirez; and (3)

1

the trial court adopted verbatim the State's four-hundred and three page Proposed Findings of Fact and Conclusions of Law even though the State's Proposed Findings contained numerous errors.

## A. Procedural History

Ramirez's Initial Application for Writ of Habeas Corpus ("Initial Application") was filed on July 9, 2009 and contained nineteen "Ground(s) for Review" challenging the legality of his confinement.[1] The State's Answer to the Initial Application was filed on September 7, 2012. The trial court held a live evidentiary hearing on November 3 and 4, 2014, during which it accepted additional testimony and affidavits relevant to the claims raised in the Initial Application. On January 20, 2015, the trial court adopted the State Proposed Findings of Fact and Conclusions of Law verbatim and recommended that relief be denied.

## B. Lead Counsel was not Qualified to Represent Ramirez, and Key Members of the Team that She Assembled Had No Experience in Cases Where the State was Seeking Death

Indigent defendants against whom the State is seeking the death penalty are entitled to high-quality legal representation. *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, Guideline 4.1, 31 HOFSTRA L. REV. 913, 952 (2003). However, none of the four most important members of Ramirez's trial team—lead counsel (Alma Garza), second chair counsel (Rolando Garza), the fact investigator (Juan Castillo), and the mitigation specialist (Gilda Bowen)—had sufficient trial or investigation experience in a case where the State was seeking the death penalty. (2 EH at 20, 80-82, 140, 155.)[2] Lead counsel

---

[1] Paul Mansur filed the Initial Application but later removed himself from the case at which time the OCW took over Ramirez's representation.

[2] "CR" refers to the Clerk's Record in Ramirez's trial. "RR" refers to the Reporter's Record in Ramirez's trial. "EH" refers to the Reporter's Record from the November 2014 evidentiary hearing held on Ramirez's Initial Application.

had previously represented defendants charged with capital murder, but Ramirez's case was her first in which the State was actively seeking death at the punishment phase. (*Id.* at 80-82.) Because she did not have trial experience in "investigating and presenting mitigating evidence at the penalty phase of a death penalty trial," she was not qualified to serve as lead counsel. *See* TEX. CODE CRIM. P. art 26.052(d)(2)(E)(ii) (2001). Second chair counsel had tried only "two or three" cases to a jury before representing Ramirez—none of them capital murder. (2 EH at 19-20.) Neither the investigator nor the mitigation specialist had ever investigated facts or mitigating circumstances in a death penalty case. (*Id.* at 140, 155.)

During Ramirez's evidentiary hearing, lead counsel noted that Hidalgo County had repeated struggles and delays in finding qualified counsel, investigators, and experts to represent the twelve co-defendants charged with capital murder in the underlying offense.[3] (2 EH at 85, 90.) The trial court echoed this sentiment, noting that Ramirez was "limited in this particular case to the lawyers that were available to try these cases . . . . [and] limited to the experts and investigators because conflicts were arising because there were so many defendants." (*Id.* at 118.) Certainly Ramirez is not the appropriate party to suffer harm for Hidalgo County's decision to simultaneously charge so many persons with potential death sentences, yet that is precisely what happened here. Ramirez's eventual death sentence was unsurprising given his defense team's lack of capital experience.

---

[3] Three men received death sentences as a result of these charges: Ramirez, Humberto Garza, and Rodolfo Medrano. A fourth co-defendant, Robert Garza, was sentenced to death for a separate offense.

**C. Despite Numerous Instances of Questionable Performance, The Trial Court Erroneously Found That Trial Counsel did a "Commendable Job of Representing [Ramirez]"[4]**

The trial court adopted the State's assertion that "[Ramirez's] trial attorneys and attorney on direct appeal had done a commendable job of representing Applicant, particularly given the material they had had to work with." (Conclusions of Law No. 4, p. 388.) This Court's independent review of the record will reveal this conclusion to be factually and legally inaccurate. According to the record created during Ramirez's post-conviction proceedings, trial counsel's allegedly "commendable" actions included:

1. Lead counsel accepted appointment to represent Ramirez despite not being qualified to do so. She did not have trial experience in "investigating and presenting mitigating evidence at the penalty phase of a death penalty trial." *See* TEX. CODE CRIM. P. art 26.052(d)(2)(E)(ii) (2001); (*see also* 2 EH at 80-82).
2. Lead counsel requested that her co-counsel of choice be appointed, despite that chosen attorney only having tried "two or three" jury trials prior to accepting appointment to represent Ramirez, none of them capital murder cases. (2 EH at 19-20.)
3. Lead and second-chair counsel were confused about who was responsible for supervising the fact investigator. (2 EH at 23, 88, 140-41.)
4. Neither the fact investigator never recalled actually speaking with lead counsel. (2 EH at 140-41.)
5. The fact investigator, nor anyone else, ever investigated the alibi that Ramirez provided for the night of the crime. (2 EH at 142, 145.)
6. Trial counsel did not interview Ramirez's cousin, who was with Ramirez the night prior to his arrest and observed Ramirez taking and then passing out from Rohypnol—evidence that would have been relevant and helpful at Ramirez's suppression hearing. (2 EH at 42-43.)
7. Trial counsel brought the wrong booking officer to testify at the suppression hearing. (2 EH at 100.)
8. Trial counsel failed to present testimony from two witnesses at the suppression hearing that they themselves labeled as "necessary" and that the trial court ordered them to present. (4 RR at 46, 50; 2 EH at 45-46.)

---

[4] (Conclusions of Law No. 4, p. 388.)

4

9. Trial counsel waited until three days **after** the suppression hearing to file a subpoena for records that they needed **for** that hearing. (2 EH at 47.)

10. The mitigation specialist only conducted three interviews outside of Ramirez himself: his mother, his father, and his then-girlfriend. (2 EH at 161-64.)

11. Trial counsel did not present testimony from family members that were willing and available to testify on Ramirez's behalf. (3 EH at 12, 18.)[5]

12. Lead counsel acknowledged that a key part of her punishment phase presentation revolved around an expert whom she believed would be permitted to testify regarding specific facts from Ramirez's upbringing. (2 EH at 112.) It is clear from the record that lead counsel was mistaken regarding the parameters of what her expert would be permitted to testify about. (2 EH at 113, 137; *see also Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014) (per curiam) ("An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*.").)

13. The specific facts that lead counsel hoped the expert would be permitted to testify regarding were excluded by the trial court as impermissible hearsay. (39 RR at 87.) This ruling came as a surprise to lead counsel. (2 EH at 65.) Instead of researching the issue regarding what her expert would be allowed to testify regarding, lead counsel relied on her past experience and what she thought the rules of evidence allowed. (*Id.* at 113-14; 3 EH at 30.)

14. Lead counsel admitted that she would have taken different actions with respect to Ramirez's trial had she known that her expert's testimony would be limited. (2 EH at 114.)

15. Trial counsel did not present testimony at the punishment phase from any witness who knew Ramirez prior to the offense occurring. In contrast, post-conviction counsel has provided testimony and/or affidavits from nineteen witnesses who knew Ramirez that were willing to testify on his behalf. (Evidentiary Hearing Exs. 1-8, 15-28, *passim*.)

16. Trial counsel failed to obtain testimony from individuals with personal knowledge of Ramirez's life, including, but not limited to, the following:
    - Ramirez's mother and father physically abused Ramirez by beating him with belts, clothes hangers, and tree branches.
    - Friends of the Ramirez family observed the violent and strained relationship between his parents.
    - Ramirez observed frequent violent confrontations between his

---

[5] At the evidentiary hearing, trial counsel disputed whether these family members were available to testify.

5

parents, and during one such confrontation when he was four, Ramirez stabbed his father to protect his mother.

- Ramirez's father beat his mother while she was pregnant with Ramirez, causing bleeding.
- Ramirez's mother placed her church ahead of her role as a mother, and would leave her son unattended for long periods of time.
- Ramirez and his family lived in poverty and depended on government assistance for basic necessities.
- Ramirez was exposed to pesticides as a child and there is research linking pesticide exposure to neurological problems.
- There was a prevalence of gang violence in the schools and neighborhood where Ramirez was raised.
- Ramirez turned to the streets based on a lack of support at home.
- Ramirez abused alcohol, inhalants, and other substances, starting at an early age.
- Ramirez's siblings and friends recall positive actions by him.

(*See* Evidentiary Hearing Exs. 1-8, 15-28, *passim.*) None of this evidence was not presented at Ramirez's trial.

A fair reading of trial counsel's representation of Ramirez establishes that their performance was far from "commendable." That the convicting court was willing to adopt such language offered by the State in their Proposed Findings of Fact and Conclusions of Law casts doubt on the appropriateness and accuracy of the court's ultimate recommendation.

## D. Rather than Conducting an Independent Analysis, the Convicting Court Adopted the State's Proposed Findings Wholesale

The State's Proposed Findings of Fact and Conclusions of Law was a four-hundred and three page document to which the court made no modifications; instead, it accepted each and every assertion by the State as accurate. Both this Court and the Supreme Court have criticized this practice. *Jefferson v. Upton*, 560 U.S. 284, 288 (2010); *Anderson v. Bessemer City*, 470 U.S. 564, 572 (1985); *Ex parte Reed*, 271 S.W.3d 698, 729 (Tex. Crim. App. 2008). This Court has instructed that "the trial judge as a neutral arbiter should . . . carefully scrutinize[] the State's proposed

6

findings to ensure that they accurately reflect the evidence in the record before adopting them verbatim." *Reed*, 271 S.W.3d at 729.

In Ramirez's case, it is clear that the court failed to do so based on the errors found in the Findings and Conclusions that were signed. For example, the signed Findings and Conclusions mistakenly refer to Dr. Gilbert Martinez as "Dr. Ramirez" on eight separate occasions. (Findings of Fact and Conclusions of Law at 43, 56-57.) Similarly, Judge Noe Gonzalez, the Judge who signed the Findings, referred to himself as "Judge Ramirez" four times in the document he signed off on. (*Id.* at 178, 277.) While typographical errors may be expected to some extent in a document of this length produced by the State, the fact that they remain uncorrected by the convicting court show that the court did not read the document in its entirety, or particularly closely, before it was signed. As such, this Court should not grant any deference to the trial court's findings in this case.

This practice of adopting the State's proposed findings of fact and conclusions of law essentially verbatim is not limited to Ramirez's case, but appears to be a regular occurrence among convicting courts. *See Ex parte Cortne Robinson*, Harrison County, WR-81,583-01 (findings signed on Aug. 25, 2014); *Ex parte Kwame Rockwell*, Tarrant County, WR-80,232-01 (Sept. 9, 2014); *Ex parte Mark Soliz*, Johnson County, WR-82,429-01 (Nov. 6, 2014); *Ex parte Garland Harper*, Harris County, WR-81,576-01 (Dec. 11, 2014); *Ex parte Gary Green*, Dallas County, WR-81,575-01 (Dec. 31, 2014); *Ex parte Teddrick Batiste*, Harris County, WR-81,570-01 (Jan. 21, 2015); and *Ex parte John Hummel*, Tarrant County, WR-81,578-01 (Jan. 21, 2015). That such a practice has become commonplace in the review of capital defendants' applications for writ of habeas corpus suggests Texas's death penalty statutory scheme no longer functions as an independent, impartial system, effectively denying Ramirez and other capital defendants their due process rights under the United States and Texas constitutions. This Court should, at

7

minimum, issue an opinion warning lower courts of the dangers of adopting the State's proposed findings and conclusions wholesale.

### E. Conclusion

In light of these deficiencies, Ramirez asks this Court to take a close look at the accuracy of the trial court's recommendation that relief be denied. Based on the concerns noted by Ramirez, this Court should grant no deference to the trial court's findings. When conducting its independent review of the proceedings in the lower court and Ramirez's Initial Application, this Court will review multiple, compelling grounds for relief, particularly regarding whether Ramirez received effective assistance of counsel during his trial. Ramirez asks that this Court grant relief and vacate his capital murder conviction and sentence, or, in the alternative, remand Ramirez's case to the convicting court for additional findings.

Respectfully submitted,

DATED:    February 9, 2015          By _____
                                        JEREMY SCHEPERS

                                    By _____
                                        ERIN ECKHOFF

8

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Applicant's Objections upon:

Court of Criminal Appeals
P.O. Box 112308
Austin, Texas 78711
(Original by e-File)

Hidalgo County District Attorney
Ted Hake, Asst. Crim. D.A.
100 N. Closner Blvd.
Edinburg, TX 78539

Juan Ramirez
TDCJ # 999490
TDCJ Polunsky Unit
3872 FM 350 South
Livingston, TX 77351

This certification is executed on February 9, 2015, at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_____
JEREMY SCHEPERS

9